## DEALER SUPPLY AGREEMENT

THIS DEALER SUPPLY AGREEMENT ("Agreement") dated                    2020_ is made between  Universal Property Services Inc. (hereinafter "Supplier"), having its place of business of 1601 Princeton Ave, Lawrenceville, NJ, and Front Street Donuts, LLC, having a mailing address of 4625 E. Street Road, Suite B, Feasterville-Trevose, PA 19053(hereinafter "Dealer") regarding the purchase and sale of branded motor fuels of the motor fuel sales facility located at:

>    5643 Ridge Ave. Philadelphia, PA
>    (the "Facility").

Now Therefore, Supplier and Dealer, intending to be legally bound, agree to the following:

### I.    Term.

(a) The term covered by this Agreement will be for 10 years, beginning on the date upon which (the "Commencement Date") Supplier, or its affiliates, causes (i) that certain Land and Building Lease Agreement dated May 2, 2003 as amended with ARFA Enterprises, Inc. ("ARFA") as tenant with leasehold rights with respect to the Facility (the "Master Lease") to be terminated and (ii) the transfer to 5643 Ridge Avenue LLC (the "Property Owner") of ownership of ARFA's Underground Storage Tank System and other Tenant Personal Property (as defined in the Master Lease) and used in connection with the Facility (collectively, the "Commencement Date Conditions") and expiring on  tenth (10th)  anniversary of the Commencement Date  (The "Expiration Date"), unless terminated earlier by law or by the terms of this Agreement or extended by the terms of this Agreement (the "Term").  The parties acknowledge and agree that notwithstanding anything to the contrary contained herein, its shall be a condition precedent to the effectiveness of this Agreement that the Commencement Date Conditions shall be satisfied and that upon the satisfaction of the Commencement Date Conditions, Supplier and Dealer shall enter into a memorandum confirming the Commencement Date.  In the event that the Commencement Date Conditions have not been satisfied on or before May 31, 2023 and ARFA exercises its option to renew the Master Lease, this Agreement shall be null and void and of no further force and effect.

(b) Dealer may cancel this Agreement, or any renewal or extension thereof by giving Supplier at least 90 days written notice of such cancellation, subject to the termination provisions of Paragraphs XIX .and the terms and conditions of the Branding Agreement. Dealer acknowledges that Dealer will be liable to Supplier for the Minimum Gallons Payment as such term is defined in the Addendum to Dealer Supply Agreement /Branding and Product Purchase Commitment, between Supplier and Dealer (the "Branding Agreement") upon or after termination of this Agreement by Dealer prior to Dealer having purchased the aggregate of the Minimum Annual Gallons due under the Branding Agreement. Supplier may request such Dealer to execute Supplier's Mutual Cancellation Agreement prior to such cancellation

1

becoming effective, under the sole discretion of the Supplier which the Supplier holds the right to agree to. Notwithstanding to the contrary contained herein, in the event that Supplier is unable to provide the Dealer for any reason the quantity of Conoco branded motor fuel (or other subsequently applicable branded fuel subject to this Agreement) ("Branded Fuel") required in order for Dealer to operate the Facility with continuous service for more than 36 consecutive hours and another Conoco (or other applicable Branded Fuel) distributor would be able to provide the Dealer with such amount of Branded Fuel, Dealer shall have the right to purchase Branded Fuel from another Branded Fuel distributor until such time as Supplier is able to furnish Branded Fuel to Dealer again. In the event that any such Branded Fuel distributor would require proof of Supplier's consent to the purchase of Branded Fuel from such Branded Fuel distributor, Supplier agrees to provide, within 24 hours of receipt of a written request thereof, such consent to the Branded Fuel distributor confirming the right of Dealer to purchase Branded Fuel from the Branded Fuel Distributor. Notwithstanding to the contrary contained herein, in the event that Supplier is unable to provide the Dealer the quantity of Branded Fuel required in order for Dealer to operate the Facility with continuous service for the period of seven (7) business days, subject to force majeur provisions of Paragraph XIII of this Agreement, Dealer shall have the right to terminate this Agreement (without payment or penalty) upon ten (10) days prior notice to Supplier and upon such termination, Dealer shall have no further obligations hereunder.

(c) In the event of a termination of this Agreement for any reason whatsoever, all associated agreements related to the Facility except any financial security agreements, mortgages, amortization agreements, notes or guarantees, shall automatically terminate.

## II.    The Facility.

(a) This Agreement applies only to Facility and is expressly contingent on Dealer providing to Supplier evidence satisfactory to Supplier that Dealer holds and will maintain through the term of this Agreement a legally binding and enforceable possessory interest in the facility.

(b) This Agreement is expressly contingent on Dealer having in place at all times on the Facility a canopy which covers all gasoline fuel dispensers ("Fuel Islands') and meeting Supplier's image standards, as may be revised from time to time by Supplier.

(c) Supplier will require that all retail gasoline fuel dispensers at the Facilities that are branded with any Identities (as defined below) shall be enabled to accept card readers in-dispensers ("CRINDS"). Dealer will install such capability at its Facility no more than 5 months after the Commencement Date.

## III.    Requirements Contract; Prices.

(a) During the Term Dealer agrees to purchase ALL its motor fuel and requirements directly from Supplier and not from any other person or entity. Subject to Section III.b. below, the price for motor fuels purchased by Dealer from Supplier will be $0.0100 cent/gallon over

2

Rack (plus oil delivery charges, taxes, duty, fees or charges levied on the product) for each grade of said products in effect for Supplier's pricing area in which the facility is located at the time when title to said products passes from Supplier to Dealer or when the product is loaded, at Supplier's option; provided, however, in no event shall the price for motor fuels purchased by Dealer from Supplier be greater than 1 cent compared to industry Conoco price as supplied in Philadelphia.

Pricing is subject to Dealer's compliance with all of the terms and conditions of this Agreement. Notwithstanding anything contained herein to the contrary, Supplier may change prices for any and all products at any time after the Expiration Date. Supplier will notify Dealer of such changes in the normal course of business and such changes shall become effective immediately upon notice.

(b) Notwithstanding anything to the contrary contained herein, in the event that a posted terminal Rack price is not available for the motor fuel brand to be supplied by Supplier, Supplier may use as the pricing for the motor fuel the Rack price for the brand of motor fuel closest to the brand standards required and within the same tier as the motor fuel to be supplied by Supplier.   Upon request by Dealer, Supplier agrees to furnish price chart according to which Supplier paid for product purchased under this Agreement or the substituted terminal Rack price as applicable.

(c) Dealer acknowledges and agrees that if Dealer fails to purchase the Minimum Annual Gallons set forth in the Branding Agreement for sale at the Premises in any Calendar Year, subject to the exceptions below, Dealer will be liable to Supplier for the Minimum Gallons Payment pursuant to the Branding Agreement at three ( 5) cents per gallon. Notwithstanding the foregoing, in the event that Dealer fails to purchase the Minimum Annual Gallons requirement after reasonable and good faith efforts to operate the Facility and for reasons not within Dealer's control, as reasonably determined by Supplier, Dealer shall be excused the Minimum Gallons Payment.

(d) If this Agreement is assigned by Supplier to a supplier, jobber, or other party, the prices to be paid by Dealer for motor fuel and other products hereunder will be as established by said jobber or other party;  provided that such prices shall not exceed those established in Section III(a) above.

### IV.    Lube Facilities.

For a period of fifteen (10) years from the Commencement Date, Dealer covenants and agrees that if any motor oils, hydraulic fluids, transmission fluids,power steering fluids, broke fluids, fuel additives, antifreeze and coolants, lubricant oils or greases ("Lube Products") are offered or sold to the public from the Facility, at least 80% of the Lube Products shall be sold under the Trade Identities or any other trademark designated by Supplier to offer Lube Products to the pubic (rights to use such marks/names being granted pursuant to, and subject to the provisions of this Agreement or other separate agreement between Dealer and Supplier).

### V.    Delivery of Motor Fuels.

3

(a) During the term of this Agreement, Supplier will deliver branded motor fuels to Dealer at the Facility in accordance with the Electronic Dealer Delivery Plan (EDDP) Agreement in effect at the time of delivery. The EDDP Agreement will automatically terminate in the event of the termination or expiration for any reason whatsoever of this Agreement between Supplier and Dealer for the Facility to which this Agreement pertains. Supplier has the ability to terminate or change delivery methods with 24 hour notice to Dealer.

(b) Supplier has the right to specify minimum delivery quantity to be full loads only. Supplier has the right to impose a surcharge of $200.00 for the delivery of less than a full load. Supplier has the right to increase this surcharge from time to time as Supplier deems necessary, with prior notice to Dealer.

(c) The quantities of motor fuels delivered to Dealer hereunder will be determined by Supplier on the basis of the temperature thereof at 60°F in accordance with "Table No. 6B of API Standard 2540, Manual of Petroleum Measurement Standards, Chapter 11.1- Volume Correction Factors-Volume II" (or any API/ASIM reissue or replacement thereof in effect of the time of measurement) or on the basis of gross volume, as Supplier may elect or as otherwise required by law.

(d) Measurements of quantities to be delivered will be made by Supplier at its terminal. In the case of EDDP deliveries, Dealer and Supplier's driver may jointly take a measurement at the time of delivery in a manner acceptable to Supplier.

(e) Dealer grants Supplier or its contract carriers 24 hour-per-day access to Dealer's motor fuel storage for purposes of delivery.

(f) Title to motor fuel shall pass to Dealer in accordance with the terms of the EDDP.

(g) Title to all products other than motor fuels shall pass to Dealer at the time of delivery, except as otherwise provided. Dealer grants supplier all purchase money security interest in all such products and the proceeds derived therefrom until products has been paid in full and funds have been received by Supplier. Risk of loss of such products shall pass to Dealer at the time of delivery.

(h) Within 24 hours of delivery, Dealer shall notify Supplier of any claimed deficiencies in the quantify of any fuel or other products delivered to Dealer. In any event, Dealer must notify Supplier in writing within three (3 ) days of said delivery of any claimed deficiencies in the quality or quantity of any fuel or other products delivered to Dealer. Unless Dealer so notifies Supplier in writing of such deficiencies within 10 days of delivery, the quality and quantity of product will conclusively be presumed to conform to the specifications included in the invoices and delivery documents provided to Dealer and to the terms and conditions of this Agreement.

## VI.    Hours of Operation.

Dealer agrees that the Facility will be kept open for operation, properly lighted, staffed 7 days a week, from 6am to 9pm in accordance with the terms of this Agreement, unless otherwise approved in writing by Supplier. In requesting such approval, Dealer specify in writing for Supplier's review and approval the business reasons why the facility cannot be open 7 days a week, from 6am to 9pm a day.

## VII.    Credit Terms.

(a) Supplier is not obligated to extend credit to Dealer, irrespective of any course of dealing

4

or trade. If Supplier does extend credit to Dealer in its sole discretion, such extension of credit is subject to requirements that Supplier's standard credit terms and such additional terms and conditions as Supplier may establish with Dealer, including but not limited to: Dealer establishing with Supplier a business risk deposit in the minimum amount of Thirty Thousand (US30,000.00) Dollars and 00 cents to be used as payment for the initial supply and delivery of Branded Fuel after the Commencement Date (the "Risk Deposit") After the initial supply and delivery of Branded Fuel, Dealer shall no longer be required to maintain a Risk Deposit unless Dealer fails to pay any amount when due, including but not limited to any check that is dishonored, or a refusal from Dealer's financial institution for any amount to be drawn or transferred under a letter of credit, by electronic funds transfer (the "EFT"), in which event Supplier may immediately suspend all deliveries to Dealer of product and impose other payment terms and if such failure or refusal is continuing for more than five (5) business days after notice to Dealer, and Dealer shall be required, by written notice from Supplier, to maintain a Risk Deposit.

(b) Dealer agrees to establish an Account with a financial institution on terms acceptable to Supplier that provides EFT services and to authorize Supplier to initiate certain transfers of funds between that account and designated accounts of Supplier for payment of any and all amounts due to Supplier under this or any other agreement with Dealer. Dealer will provide Supplier with the information and any authorizations necessary to debit and credit Dealer's account via EFT transfer. Dealer agrees to provide the necessary authorization and assistance to implement such additional EFT's promptly upon the request of Supplier.

(c) EFT for gasoline, EPOS, etc. shall be next day.

(d) Supplier has the right to assess finance charges of the lesser of three and a half (3.5%) percent or highest maximum rate allowed under law on oil amounts not paid by Dealer on the due date. Supplier has the right to impose a service and late payment charge for each check and/or EFT which is dishonored for insufficient or uncollected funds, whether or not subsequently paid by Dealer.

(e) Without limiting Supplier's remedies or Dealer's breach or default hereunder, Dealer's failure to keep all credit obligations current or one or more incidents of financial distress or anticipated financial distress may result in the denial of credit and Supplier requiring Dealer to prepay for all products to be delivered hereunder by wire transfer or other method acceptable to Supplier.

(f) Intentionally omitted.

(g) Dealer must notify Supplier in writing of any questions or disputes regarding any charges or other items included in any invoice or statement issued to Dealer by Supplier within sixty (60) days after the dale of invoice or statement except for disputes regarding the quality or quantity of products delivered, which must be submitted pursuant to Section V.(g) herein. Unless Dealer provides Supplier with such written notice within such sixty (60) day period, the amounts set forth in such invoice or statement will be conclusively presumed to be accurate. Time is of the essence for any and all provisions of this Agreement.

### VIII. Payment Methods Including Credit Cards.

(a) Supplier may from time to time endorse and sponsor specific proprietary and third party payment methods including certain credit cards, charge cards, fleet cards,

5

debit cards, pre-paid cards and the like (collectively, "Payment Methods") for use of the facility. Supplier will not be obligated to sponsor or participate in any specific payment methods program initiated by Dealer and may withdraw its sponsorship of, or participation in any program at any time, or may condition any sponsorship or participation upon payment to Supplier of service and equipment fees.

(b) Intentionally omitted.

(c) The facility will be equipped with electronic point-of-sale ("EPOS") equipment approved by Supplier for processing transactions on Supplier's Payment Methods network. All Supplier approved EPOS equipment will, at all times, be connected to Supplier's Payment Methods network and will be operated using Supplier's most current Payment Methods software. Dealer will at Dealer's cost, install Supplier's most current software at the request of Supplier. No right, title or ownership interest in any software will be transferred to Dealer. Supplier grants to Dealer a limited-use license to such software for this purpose during the term of this Agreement. Dealer shall immediately cease all use of such software upon expiration or earlier termination of this Agreement. Dealer acknowledges that the software and the specifications are proprietary products of Supplier or its vendors. Under no circumstances will Dealer reverse engineer, decompile, disassemble or otherwise attempt change the code for the software or alter its intended functionality.

(d) Unless Dealer purchases EPOS equipment and software approved by Supplier, Dealer will pay to Supplier a fee for the leasing of Supplier-approved EPOS equipment and software in the amount of $225.00 per month for network connection (only) to EPOS equipment or the Facility. The fee includes rental, set up, freight, state and local taxes, but excludes costs for only maintenance, newer versions or updates to the software and the equipment. Supplier reserves the right to change or upgrade the Supplier-approved EPOS equipment by giving Dealer written notice or such change or upgrade. Supplier reserves the right to change the fee for the leasing of Supplier-approved EPOS equipment by giving Dealer thirty (30) days written notice of such fee change; provided, however, such fee shall not be increased by more than ten percent (10%) per year.

### IX.  Condition of Facility.

(a) Dealer recognizes the Supplier has developed a favorable reputation for the sale of motor fuel and associated products and the rendering of high quality services and that the Trade Identities (as defined below) and facility designs and appearance represent an image distinguished of high standards of product quality, facility appearance (inside and out) and customer service. Dealer agrees to manage, operate and maintain the facility in a manner which will maintain and enhance the image and reputation of Supplier and its licensors and which in no event will detract from Supplier or its licensor's image or reputation.

(b) In particular and without limiting the foregoing obligations, Dealer and its employees agree to do the following at Dealer's sole cost and expense:

  i)   Comply with all applicable Federal, State, and local laws, ordinances, rules and regulations, pertaining to health and safety of consumers and the facility, recognizing that clean, sanitary and healthy conditions are essential in the operation of the facility. Dealer agrees all date- coded consumable products will be sold or disposed of on or prior to the expiration date indicated thereon;

6

ii)    Keep the premises, buildings (interior and exterior), restrooms, sidewalks, approaches, driveways and landscaping in good condition and repair, properly lighted, clean, safe, sanitary and free of trash, rubbish and other debris;

iii)    Operate the Facility in a manner that actively promotes the sale of Supplier branded motor fuels and branded motor oils and other merchandise and services customarily sold at such facilities, keeping the Facility open for operation from 6am to 9pm each day, seven (7) days a week, except as otherwise agreed to in writing by Supplier;

iv)    Keep the approaches. driveways, entrances. fuel areas, and service areas uncluttered and free at all limes of parked vehicles, trailers, and other obstructions, including ice;

v)    Render courteous, prompt, efficient and diligent service to customers. Dealer acknowledges that providing superior customer service is essential to the success of Dealer's business and to the reputation and integrity of Supplier and therefore agrees to appropriately respond to customers as promptly as possible, but in any event within 72 hours of receipt of on inquiry or complaint and to resolve customer inquiries or complains within a maximum of 15 days from notification of said complaint. Dealer will diligently pursue resolution of all customer complaints as quickly as possible

vi)    Dress in Supplier-approved, coordinated uniforms with visible and approved logos used by the Supplier. Dealer and each of Dealer's employees must be able to communicate clearly and effectively with customers and to render superior service to customer;

vii)    Provide a safe place to work for Dealer's employees, and maintain and operate the Facility in compliance with all applicable laws, regulations and rules concerning health and safety of the workplace and environmental protection and compliance. Dealer will provide all employees with adequate training concerning workplace health and safety, safe work practices and environmental protection and compliance. Dealer acknowledges that safety or the workplace and environmental protection and compliance are Dealer's responsibility and not the responsibility of Supplier;

viii)    Notify Supplier immediately in writing in the case of an emergency of the Facility or otherwise involving Supplier branded operations. Emergency events include, without limitation, the death or injury of any nature of anyone on or about the Facilities, including but not limited to any customer, employee, contractor, subcontractor, invitees, or any other person(s) and including but not limited to transport or tank truck accidents, product spills or environmental damage or release, or any and all events that may have or presumed to have a negative impact on Supplier's public image or community relations;

ix)    Keep abreast of the changing competitive environment, reacting to such changes in a way to maximize the level of fuel and non-fuel business at the Facility;

x)    Keep restrooms, where available, clean and adequately stocked with soap and paper products;

xi)    Operate at least one of the Fuel islands or one of the dispensers if the facility has only one Fuel Island) on a self-serve basis permitted by law;

7

xii)  Comply with all laws, ordinances, rules and regulations of constituted public authority governing the use and occupancy of the Facility and the conduct of Dealer's business at the Facility;

xiii)  Display only those signs and advertising materials that are in conformity with Supplier's standards and approved by Supplier. Dealer agrees not to utilize any of the following at the Facility )unless approved by Supplier in writing or required by law to maintain necessary permits or licenses to conduct business at the Facility) including but not limited to  window signs, dimmers exterior signs with graphics and colors other than those specified by Supplier, handwritten signs, neon signs, exit door signs placed in areas other than those designated on the plot plan and interior signs attached to walls, and ceiling or cigarette merchandisers;

xiv)  Participate in any Supplier sponsored mystery shopper program. Supplier will notify Dealer of the specific requirements of any such program. Dealer must score no less than the established retail target as specified by the then current requirements of the mystery shopper program; and

xv)  Attend all local business meetings and all  training  sessions required,  conducted or sponsored by Supplier for the purposes of the introduction of marketing programs or for the exchange of information  may have an impact upon the business operations of the Dealer or to facilitate the flow of information between Dealer and Supplier;

(c) Dealer shall not do or allow anything to occur at the Facility which could derail from or disparage the image or reputation of the Facility or the Trade Identities. In particular, without limiting the foregoing, Dealer shall not do or permit anyone else to do or allow at the facility any of the following:

i)  Operate any business or engage in any activity other than the Dunkin Donuts' operations as the Facility and the sale of motor fuels, motor oils, automotive accessories and services and convenience store merchandise without Supplier's prior written approval. Prohibited activities include, without limitation, the parking, storage, rental or sale of motor vehicles or trailers, or wrecked or abandoned vehicles.

### X.    Training.

(a) Dealer must attend and successfully complete all components of Supplier's current Dealer training school prior to commencing business operations at the Facility, unless Supplier agrees to waive this requirement because Dealer is already an approved Dealer at another Facility and has recently completed Dealer Training School.

(b) Dealer must provide enough, trained and qualified employees to operate the facility during all required hours of operation. Dealer and dealer 's management level employees shall, at Supplier's request and at Dealer's cost and expense, participate in Supplier's training programs as required by Supplier's dealer Training School. Dealer shall be responsible for the costs associated with such training including any mandatory training courses.

### XI.    Compliance with Laws.

(a)    Dealer represents and warrants to Supplier it is and shall remain informed about

8

and is in full compliance with and shall comply fully with all federal, stole, and municipal laws, rules, regulations, ordinances, use permits, and all conditions and restrictions with regard to the use and condition of the Facility and with regard of Dealer's activities thereon. Without limiting the foregoing. Dealer must comply with all requirements of federal, state. and local occupational, health and safety agencies, and environmental protection agencies, concerning the receipt, storage, handling, use, sole and dispensing of motor fuels, the disposal of waste materials, and Dealer's other activities on the Facility, including particularly those governing recovery of vapors.

(b)    Supplier shall comply with all requirements of federal, state. and local occupational, health and safety agencies, and environmental protection agencies, concerning the supply, handling, transport, and delivery of motor fuels to and at the Facility, and Supplier's other activities on the Facility.

### XII.    Liability Indemnification.

(a) In addition to Dealer's indemnification obligations under Section XII, Dealer shall indemnify, defend and hold Supplier, its parents, subsidiaries and affiliated companies, and their respective shareholders, directors, officers, agents, employees contractors, invitees and licensees (collectively "Supplier Indemnitees"), harmless from and against any and all losses, suits. claims, demands, courses of action, liabilities, costs or expenses including reasonable attorneys' fees and costs of defense of whatever kind or nature including but not limited to those for personal injury, death or property damage to Supplier Indemnitees entering upon the Facility, directly or indirectly arising from in whole or in part, from or as a result of the following (except to the extent arising from Supplier's or Supplier Indemnitees gross negligence or intentional acts.

    i)    Any default or breach by Dealer of any obligation contained in this Agreement or any other agreement with Supplier;

    ii)    Any violation of the Branding Covenant (as hereinafter defined);

    ii)    Any act, omission, fault or negligence of Dealer or Dealer's agents, employees, control tors, invitees or licensees, regardless of whether caused by the joint concurrent, contributory or comparative fault, negligence, breach of warranty, strict liability or breach of any legal duly whose by Supplier;

    iii)    Any allegation of agency or any other relationship by which supplier would be held responsible for the acts or omissions of Dealer or dealer's employees or agent's;

    iv)    Dealer's use or cessation of use of the Trade Identities;

    v)    The purchase, sale, use or storage of any goods, products, equipment or other items of the Facility, or the repair, maintenance or condition of the Facility and all equipment and fixtures appurtenant thereto, or the purchase or sale of any services at the facility;

    vi)    the conducts of any illegal activity at the Facility;

    vii)    The violation of any Federal, State or local law, rule, regulation or court order or governmental or agency directive.

### XIII.    Force Majeure and Allocation.

(a) Supplier is excused from delay or nonperformance to the extent not within Supplier's control including without limitation, if Supplier is unable to meet the demand for product

9

hereunder regardless of whether or not Supplier may have diverted or allocated certain supplies in order to alleviate shortages due to exhaustion, reduce supply or unavailability of product, or component necessary in the manufacture or production of such products, delays caused by third party contractors or supplies. Either party is excused from delay or nonperformance in the event of any condition whatsoever beyond said party's reasonable control, including, without limitation, unavailability, failure or delay of transportation; Acts of God; labor difficulties; explosions; storms; breakdown of machinery or equipment; fire, riots; epidemics; pandemics; insurrection; any state of emergency, Federal, State or Local, war conditions in this or any other country and compliance with any law or governmental order, regulation, recommendation, request or allocation program (whether voluntary or involuntary).

(b) In the event of any of the contingencies or conditions referred to in the preceding subparagraph, Supplier has the right to curtail deliveries or allocate its supply of products for sale among its customers in any manner which in its sole discretion is fair and reasonable in the circumstances, and shall not be obligated to buy or purchase other supplies of product or to in any way make up any product not delivered. Supplier is not responsible in any manner for any and all losses or damages which Dealer may suffer as a result of any such curtailment or allocation by Supplier.

### XIV.  Trade Identities.

(a) Simultaneous with the execution of this Agreement, Dealer or its principal(s) and Supplier shall enter into the Branding Agreement, which Branding Agreement, among other things, governs the minimum purchase requirements of Dealer during the Term of this Agreement and requires that retail motor fuel, including but not limited to gasoline, but excluding diesel fuel (collectively, "Motor Fuel") stored, advertised or sold to or from the Facility shall be sold under the "Conoco" trademarks and "Trade Identities" in accordance with the terms of the Branding Agreement. During the "Brand Covenant Period" (as defined in the Branding Agreement), the Property's "Trade Identities" shall include in addition to trade marks, trade names, service marks, logos, brand names, trade dress, design schemes, insignia, color schemes, and the like. During the term and subject to the "Supplier Rebrand Requirements" (hereinafter defined), the Facility shall be imaged in accordance with standards. policies and procedures required by Supplier, as may be amended from time to time. During the Brand Covenant Period, the Facility may not be operated, used or improved in a manner that violates the "Brand Covenant" (as defined in the Branding Agreement). The Brand Covenant shall be binding upon Dealer, its successor-in-interest and permitted assigns, and any overspending remedies hereunder may be enforced by Supplier against Dealer and/or any subsequent lessee or dealer at the Facility. During the Brand Covenant Period, any lease, sale, assignment, encumbrance or other transfer of any of the Facility shall be made expressly subject to the Brand Covenant. Dealer and Supplier covenant and agree that Supplier shall undertake to arrange for and bear the cost of the replacement and installation of the imaging of the Facility in accordance with the Conoco Trade Identities, including the replacement and installation of all signs, decals, logos. emblems necessary to contain convert the Facility from the existing branding to the Trade Identities required by the Branding Agreement ("Supplier Rebrand Requirement").

10

(b) If there has been a breach or default of the Brand Covenant for the Facility for any reason (other than as otherwise permitted under the Branding Agreement), Dealer shall pay to Supplier the Brand Covenant Payment which is a payment equal to the product of (i) the aggregate Minimum Annual Gallons required to be purchased under the this Agreement by Dealer form Supplier; (ii) multiplied by the number of years remaining in the Brand Covenant Period following the Brand Covenant Breach;(iii) multiplied by $0.05 per gallon. Supplier may bill dealer's account for the amount of the Brand Covenant Payment of any time following a Brand Covenant Breach. Supplier will charge dealer's account for Minimum Gallons Payment, as defined and pursuant to this Agreement. In addition, Supplier may pursue any other remedy available at law or in equally in order to collect such payment.

(b) During the term of this Agreement, Dealer may only Use, on a limited and nonexclusive basis, the Trade Identities authorized by Supplier from time to time only in connection with the advertising, distribution, and/or sale of products and services specifically designated by Supplier. The Trade Identities include those in use by Supplier to the time this Agreement is entered into by the Parties, as well as those Trade Identities that Supplier may subsequently adopt or are the subject of a license to use as may be acquired by Supplier.

(c) The permission to use the Trade identification is governed by the terms and conditions of this Agreement, the Branding Agreement and all related agreements between Supplier and Dealer and those agreements between Supplier and its licensors. In addition, Dealer will use Trade Identities only in accordance with the guidelines, policies, image programs, procedures, requirements, specifications and standards issued by Supplier or its licensors, as amended from time to time, including Supplier's policy for proper handling of motor fuels and operation of Facility. Supplier shall not be liable for the termination to any agreement between Supplier and Licensor relating to only of the Trade Identities, howsoever terminated and, in such event, Dealer shall immediately cease all use thereof.

(d) Supplier has exclusive discretion as to whether and in what manner its Trade Identities shall be displayed at the Facility and may enter the Facility, at any time during or after the term hereof to erect or remove said Trade Identities without any liability or obligation to Dealer.

(e) Dealer must not use Trade Identities in connection with the advertising, distribution or sale of: (i) any mixture, blend, dilution or adulteration of a product selected or supplied by Supplier; (ii) produces not sold in Supplier's original packages and containers or not sold through dispensing equipment approved by Supplier, or (iii) any product not selected or supplied by Supplier. Supplier has the right al all times to inspect products, books and records in the possession or control of Dealer to determine compliance with these provisions and Quality standards.

(f) Dealer or any subsidiary or affiliate of Dealer, or agent or representative thereof shall not use the Trade Identities as part of Dealer's own trade identities. Dealer acknowledges and agrees that all benefit derived from the use of the Trade Identities shall accrue to Supplier or its licensors.

(g) If Dealer wishes to use Trade Identities in conjunction with Dealer's business forms, advertising materials and the like, Dealer may do so only if the words "Products Dealer" appear adjacent to the Trade Identities.

(h) If Dealer adopts any of the Trade Identities or any successor as part of the Dealer's corporate name, then Dealer agrees that, upon the expiration or termination of this

11

Agreement for any reason whatsoever, Dealer will immediately take steps to amend its corporate charter to delete such Trade Identities or any successor as part of the corporate name, and will take all necessary steps to immediately terminate any further use of the company name.

(i) If Dealer for any reason whatsoever discontinues the sale from the Facility of Representative Amounts, as defined herein of any grade of branded motor fuels, Dealer, as a step to eliminate possible confusion of the public, shall remove from display on the Facility or conceal in a manner by approved by Supplier, all signs, decals, logos. emblems using or containing any of the Trade Identities. As used in this Agreement, "Representative Amounts" means a sufficient amount of each grade and type of motor fuel offered to Dealer so that Dealer shall at all times have each grade and type available for resale from the facility in such manner are necessary to satisfy customer demand for such grades and types, as determined by Supplier in its sole and absolute discretion.

(j) Upon the expiration or termination of this Agreement for any reason whatsoever, Dealer must immediately cease using Trade Identities and any marks confusingly similar thereto and return to Supplier all signs loaned by Supplier lo Dealer, in accordance with the provisions of this Agreement. If Dealer fails to discontinue or cause to be discontinued any and all use and display of this Identities after such expiration or termination, Supplier is hereby expressly given the right to enter upon the premises and remove or obliterate all or any part of only signs, logos, decals, emblems and other materials bearing or displaying Trade identifies of Dealer's expense. without any liability or obligation to Dealer.

(k) Supplier retains at all times the right to change the brand at any time and substitute any of its other Trade Identities in their place, provided that in the event of such substitution the Supplier shall undertake to arrange for and bear all costs and expenses in connection with de-branding from the existing Trade Identities and the replacement and installation of all signs, decals, logos, emblems and similar indicia that must be replaced as a result of such change and/or substitution.

## XV.    Grounds for Termination and Non-renewal.

Supplier reserves the right at any time to terminate or non-renew this Agreement, and all associated agreements, upon the occurrence of any of the following:

(a) Breach by Dealer of any provision of this Agreement to the extent that such breach shall not be cured within thirty days after Dealer's receipt of written notice of such reach.

(b) Abandonment of the Facility by Dealer or failure by Dealer for any reason to operate the Facility for normal sales of motor fuel during the business hours specified herein for 30 consecutive days or such lesser period which under the facts and circumstances constitutes an unreasonable period of time.

(c) Conviction of Dealer of any felony involving moral turpitude.

(d) Commission by Dealer or any of Dealer's employees or agents of any deceptive, fraudulent, illegal, immoral, or other improper act relevant to the operation of the

business on the Facility which is detrimental to Supplier to any member of the public, including without limitation: (1) participation in any fraudulent or improper use of any credit, debit or pre-paid card or motor club membership card issued or honored by Supplier; (2) tampering with pump meters, misrepresentation of pump meter readings and/or the reporting thereof, and the like; (3) violation of any consumer protection law or regulation; and (4) purchase by Dealer, without Supplier's consent, of credit card tickets from other dealers covering sales of Supplier's products.

(e) Failure by Dealer to pay to Supplier in full or in a timely manner when due all sums to which Supplier is legally entitled.

(f) Destruction of all or a substantial part of the Facility.

(g) Condemnation or other taking, in whole or in part, of the Facility pursuant to the power of eminent domain or a conveyance in lieu thereof.

(h) Failure of Dealer to comply with any law or regulation relevant to the operation of Dealer's business on the Facility, subject to the terms and conditions of this Agreement and the Sublease.

### XVI.  Remedies.

On the termination or expiration of this Agreement or any renewal or extension thereof, Supplier, at any time thereafter, has the right to sue for and recover all damages accrued or accruing under this Agreement and the Branding Agreement, or arising out of any violation thereof, and Supplier may so sue and recover without declaring this Agreement void. Supplier may pursue any other remedies nor any violation of this Agreement, the Branding Agreement or any of its covenants by Dealer. The above enumerated remedies shall be  at the sole  option and discretion of Supplier, and the pursuit of only one shall not amount to an election or bar the pursuit of any other remedies, whether or not listed herein. Termination of this Agreement shall not affect or bridge in any way the rights and obligations of the parties accruing prior to termination.

### XVII.  Rebates and Incentives.

During the term of this Agreement, Supplier agrees to credit Dealer's account with all rebate, image, appearance and incentive amounts paid unto Supplier by Conoco or any other branded supplier to Supplier with respect to the Facility in connection with any special events, special incentives, marketing promotions, time-of-the-year specific promotions, and any incentives, rebates and promotions provided by Conoco or any other branded supplier not in the normal course of business with respect to pricing of motor fuel.

### XVIII. Notices.

All notices given pursuant to this Agreement ore considered to be properly given

13

if delivered personally or sent by certified mail, return receipt requested or by nationally recognized overnight mail, addressed to Dealer of the mailing address as shown in the introduction to this Agreement and to Supplier of 1601 Princeton Ave, Lawrenceville, NJ 08648 direction to the attention of the Regional Vice President.

### XIX.  No Waiver.

No failure to act on an incident of breach and no course of dealing will be construed as the waiver of the right to act. The waiver of any breach of any covenant, condition or stipulation contained herein shall not be taken to be a waiver of any subsequent breach of the same or any other covenant, condition or stipulation. Any failure of Supplier to enforce rights or seek remedies upon any default of Dealer with respect to any of the obligations of Dealer hereunder will not prejudice or affect the rights or remedies of Supplier in the event of any subsequent default of Dealer.

### XX.    Severability.

Should any of the provisions contained in this Agreement become illegal or such unenforceable as to Dealer by state or federal statute or otherwise, this Agreement, absent provision(s) will remain in full force and effect f. In the event any provision hereof deemed material by Supplier is invalidated or voided, Supplier, at ifs option, may terminate this Agreement. If subsequent to the date of this Agreement valid State or federal laws or regulations governing the relationship between Dealer and Supplier take effect, this Agreement will be considered to incorporate any mandatory requirements of such laws or regulations so long as they shall be effective and any provisions of this Agreement in conflict with those laws shall be void.

### XXI.   Execution.

Dealer is aware that this Agreement may be signed on behalf of Supplier only by a regional account executive or one having authority superior to a retail account executive and acknowledges that this Agreement is not executed until so signed. Dealer expressly acknowledges and agrees that no agent or employee of Supplier below the level of a regional account executive may waive, alter or modify any of the provisions of this Agreement or in any way bind Supplier to obligations not set forth in this Agreement. The provisions of this Agreement may not be waived, altered or modified except by a written agreement which is executed by Dealer and Supplier and delivered to Dealer. THIS AGREEMENT SHALL NOT BE BINDING UNLESS EXECUTED BY SUPPLIER AND DEALER.

### XXII. Miscellaneous.
(a) Except as otherwise permitted in Section 1(b) above, if dealer purchases fuel from any other supplier, person, or entity, it will trigger an automatic breach. In such event, .05 cents per gallon charge on any gallon requirement not fulfilled will be due immediately.
(b) Supplier reserves the right to change the brand at anytime subject to Supplier's obligations set forth in Section XIV(k) above. .

14

(c) Security deposit of $30,000 will be due immediately to secure the initial fuel purchases at the Facility.

### XXIII. Governing law.

The provisions of this Agreement and all questions with respect to the construction and enforcement thereof and the rights and liabilities of the parties hereto shall be governed by, and construed and enforced in accordance with, the laws of the State of Pennsylvania without regard to its conflict of laws principles.

### XXIV. Waiver of Jury Trial.

EXCEPT AS PROHIBITED BY LAW, THE PARTIES SHALL, AND THEY HEREBY DO, EXPRESSLY WAIVE TRIAL BY JUPY IN ANY LITIGATION ARISING OUT OF CONNECTED WITH OR RELATING TO THIS AGREEMENT OR THE RELATIONSHIP CREATED HEREBY. WITH RESPECT TO ANY MATTER FOR WHICH A JURY TRIAL CANNOT BE WAIVED, THE PARTIES AGREE NOT TO ASSERT ANY SUCH CLAIM AS A COUNTERCLAIM IN, NOR MOVE TO CONSOLIDATE SUCH CLAIM WITH, ANY ACTION OR PROCEEDING IN WHICH A JURY TRIAL IS WAIVED. THIS SECTION WILL SURVIVE CLOSING AND TERMINATION OF THE AGREEMENT.

### XXV. XXIII. Counterparts.
This Agreement may be executed in multiple counterparts all of which when taken together shall constitute one Agreement.

15

IN WITNESS WHEREOF, the parties have or have caused this Agreement to be executed as of the date first above written.

**SUPPLIER:**

UNIVERSAL PROPERTY SERVICES INC

By: _____

Shamikh Kazmi

**DEALER:**

FRONT STREET DONUTS LLC

By: _____

Chandresh Patel, Manager

16

**ADDENDUM TO DEALER SUPPLY AGREEMENT (BRANDING AND PRODUCT PURCHASE COMMITMENT)**

This Addendum to Dealer Supply Agreement, dated _____, 2020 ("Addendum"), is between Universal Property Services INC. "Supplier" and Front Street Donuts, LLC "Dealer").

## ARTICLE 1.
## DEFINITIONS AND PROCEDURES

1.1 Definitions. (a) For purposes of this Addendum, the following terms have the meanings set forth below:

i) "Brand" means the brand and any other trademark or distinctive name identifying retail Motor Fuel offered for resale by Supplier;

ii) "Calendar Year" means the twelve- month period commencing on January 1st and ending on December 31st;

iii) "Minimum Annual Gallons" means the gallons of Products set forth on Schedule 3.1(c).

iv) "Minimum Gallons Payment" means a payment equal to the difference between the
Minimum Annual Gallons and the gallons of Products actually purchased under the DSA during that Calendar Year (if less than the amount of Minimum Annual Gallons), multiplied by $0.05. An example of the Minimum Gallons Payment is set forth on Schedule 3.1(c) of this Addendum;

v) "Minimum Annual Gallons Period" means the five-year period commencing on the Commencement Date.

vi) "Motor Fuel" means retail motor fuel, including but not limited to gasoline and diesel fuel;

vii) "Products" means Motor Fuel sold by Supplier pursuant to the DSA to Dealer under the trademarks or other branded motor fuel offered by Supplier.

## ARTICLE 2.
## BRAND COVENANT

2.1 From and after the Effective Date until the end of the Minimum Annual Gallons Period (such period being the "Brand Covenant Period") if Motor Fuel is stored, advertised or sold at or from the Facility, the Motor Fuel stored, advertised or sold shall be sold under the Brand designated by Supplier from time to time ("Brand Covenant"); provided however, in the event that Supplier and any other supplier is unable to provide the Dealer with Motor Fuel under the Brand in order for Dealer to operate the Facility with continuous service for more than 36 hours, Dealer shall have the right to purchase Motor Fuel under another brand of available Motor Fuel closest to the Brand from Supplier, or if Supplier is unable to provide any brand of Motor Fuel from another supplier, until such time as Supplier is able to furnish Motor Fuel under the Brand to the Dealer.

Liquidated Damages. SUPPLIER AGREES THAT, IN THE EVENT DEALER FAILS TO COMPLY

WITH THE BRAND COVENANT SET FORTH IN SECTION (the "BRAND COVENANT"), THE BRAND COVENANT PAYMENT SET FORTH IN SECTION 2.1(C) SHALL CONSTITUTE LIQUIDATED DAMAGES REPRESENTING A REASONABLE AND GOOD FAITH ESTIMATE OF SUPPLIER'S ACTUAL DAMAGES FOR SUCH FAILURE BY DEALER.

THE PARTIES AGREE THAT THE BRAND COVENANT PAYMENT, AS LIQUIDATED DAMAGES, IS (O) THE RESULT OF THEIR GOOD FAITH EFFORT TO ARRIVE AT A REASONABLE FORECAST OF SUPPLIER'S PROBABLE ACTUAL DAMAGES AS A RESULT OF THE BREACH OF SECTION 2.1, (B) IS AN INTENDED APPROXIMATION, IN AS MUCH AS POSSIBLE, OF SUCH POTENTIAL ACTUAL DAMAGES, AND (C) NOT INTENDED AS ANY FORM OF PENALTY. DEALER AND SUPPLIER FURTHER AGREE AND STATE THAT THE BRAND COVENANT PAYMENT, AS LIQUIDATED DAMAGES, EFFECTUATES THEIR INTENT TO AVOID THE COSTS AND LENGTHY DELAYS THAT WOULD RESULT IF SUPPLIER FILED A LAWSUIT TO COLLECT ITS DAMAGES FOR A DELAY, DEFAULT OR BREACH OF THIS ARTICLE 2. DEALER WAIVES AND RELEASES ANY RIGHT TO SUE SUPPLIER OR BRONSON TO CHALLENGE OR RECOVER THE BRAND COVENANT PAYMENT ON GROUNDS THAT IT IS UNREASONABLE IN AMOUNT, CONSTITUTES A PENALTY, OR HAS NOT BEEN AGREED UPON AS REASONABLE LIQUIDATED DAMAGES FOR DEALER'S BREACH OF ARTICLE 2.

### ARTICLE 3.
### MINIMUM GALLONS

3.1 <u>Minimum Gallons Commitment.</u> During each Calendar Year during the Minimum Annual Gallons Period, Dealer shall purchase from Supplier, under the terms of the DSA, the Minimum Annual Gallons for resale through the Premises. The Minimum Annual Gallons for any partial Calendar Year during the Minimum Annual Gallons Period shall be prorated for the number of months within the Minimum Annual Gallons Period.

3.2 <u>Minimum Gallons Payment.</u> If at the end of any Calendar Year during the Minimum Annual Gallons Period, Dealer fails for any reason to purchase the Minimum Annual Gallons (as the same may be prorated) for resale through the Premises, Dealer shall pay Supplier the Minimum Gallons Payment pursuant to the provisions of this agreement of this Addendum; provided, however, notwithstanding the foregoing, if Dealer fails to purchase the Minimum Annual Gallons after reasonable and good faith efforts to operate the Facility and for reasons not within Dealer's control, as reasonably determined by Supplier, Dealer shall be excused the Minimum Gallons Payment.

3.3 Payment of the Minimum Gallons Payment shall be made pursuant to the electronic fund transfer provisions of the Section 5.2 of the DSA.

3.4 <u>Liquidated Damages.</u> SUPPLIER AGREES THAT, IN THE EVENT DEALER FAILS TO COMPLY WITH THE MINIMUM ANNUAL GALLONS COMMITMENT SET FORTH IN SECTION 3.1, THE MINIMUM GALLONS PAYMENT SET FORTH IN SECTION 3.2 SHALL CONSTITUTE LIQUIDATED DAMAGES REPRESENTING A REASONABLE AND GOOD FAITH ESTIMATE OF SUPPLIER'S ACTUAL DAMAGES FOR SUCH FAILURE BY DEALER.

THE PARTIES AGREE THAT THE MINIMUM GALLONS PAYMENT, AS LIQUIDATED DAMAGES. SUPPLIER'S RECEIPT OF THE MINIMUM GALLONS PAYMENT, AS LIQUIDATED

DAMAGES, SHALL CONSTITUTE A WAIVER OF SUPPLIER'S RIGHT TO SPECIFIC PERFORMANCE OF ARTICLE 3 OF THIS AGREEMENT. DEALER WAIVES AND RELEASES ANY RIGHT TO SUE SUPPLIER TO CHALLENGE OR RECOVER THE MINIMUM GALLONS PAYMENT ON GROUNDS THAT IT IS UNREASONABLE IN AMOUNT, CONSTITUTES A PENALTY, OR HAS NOT BEEN AGREED UFON AS REASONABLE LIQUIDATED DAMAGES FOR DEALER'S BREACH OF ARTICLE 3.

### ARTICLE 4.
### MISCELLANEOUS

4.1     Governing Law. The provisions of this Addendum shall be construed in accordance with the internal laws of the Commonwealth of Pennsylvania. The Parties hereby consent to the sole and exclusive jurisdiction of the courts located in Philadelphia County, Pennsylvania for the purposes of resolving any disputes arising hereunder.

4.2     Successors. This Addendum is binding on and enforceable against the administrators, legal representatives and permitted successors and assigns of each of Supplier and Dealer.

4.3     Waiver. No waiver by any party of any breach of the covenants and/or agreements set forth herein, or any rights or remedies provided hereunder and no course of dealing shall be deemed a continuing waiver of the same or any other breach, right or remedy, unless such waiver is in writing and is signed by the partly sought to be bound. The failure of the exaciseany right or remedy shall not be deemed a waiver of such right or remedy in the future.

4.4     Assignment. This Addendum and the rights, duties and obligations of Dealer hereunder may not be assigned (including by operation of law) without the prior written consent of Supplier.

4.5     Notices. All notices and other communications pursuant lo this Addendum shall be in writing and shall be deemed to have been received when delivered to the address |and in the manner set forth in the tease.

The Parties have executed this Addendum as of the Effective Date set forth above.

Universal Property Services Inc.

By:_____
Name:_
Title: _

DEALER:

Front Street Donuts, LLC

By:_____
Name:
Title:

Schedule 2.1(c) Brand Covenant Payment

| Site number | Address | Minimum Annual Gallons Per Year |
|---|---|---|
| | 5643 Ridge Ave. Philadelphia, PA | 400,000 gallons |

Universal Property Services INC

By:_____
Name:_____
Title: _____

DEALER:

FRONT STREET DONUTS, LLC

By:_____
Name:_____   Chandresh Patel
Title:_____   Manager